Fowler *v.* The Mutual Life Insurance Company.

IRA D. FOWLER, Administrator, &c., *v.* THE MUTUAL LIFE INSURANCE COMPANY.

(GENERAL TERM, THIRD DEPARTMENT, DECEMBER, 1870.)

In an action upon a life policy, containing a clause which rendered it null and void in case the assured should die by his own hand, the defendant pleaded that the insured had caused his own death and annulled the policy, and it appeared that he had died by suicide from a pistol shot; there were indications in the room he occupied that he had also taken poison, and a letter from him was found there, telling his brother that he had suffered from the fear of becoming insane from maladies which he despaired of curing, and had concluded to end his sufferings, that night, by poison, which he had carried for several days; it also appeared that he was afflicted with a disease, of which the tendency was to produce a morbid mental state; that he was a spiritualist; that for some days immediately preceding his death he appeared a little excited, was absent

minded and not as cheerful or talkative as ordinarily. The court refused to submit the question of insanity to the jury, and also the question whether the suicide was involuntary or voluntary, and directed a verdict for the defendant. — *Held*, that there was no error.

*Held*, further, that the question was, whether the act of self-destruction was criminal, intentional and voluntary, designed to take life, and the assured competent to realize the consequences of the means employed by him; not whether he was sane or insane.

THIS case came before the court upon exceptions ordered to be heard in the first instance at General Term.

The cause was tried at the Schuyler Circuit in December, 1869, before Justice BOARDMAN and a jury.

The action was brought to recover the amount of a life policy issued by defendant to one Lyman H. Fowler, of date January 19, 1867, for $1,000.

The defence to the action by the answer was based upon the grounds:

1st. That Lyman H. Fowler, the applicant for the policy, answered a printed interrogatory untruly, as to the cause of his father's death, his answer being that the death was caused by drowning, whereas it is claimed that such drowning was suicidal, which was concealed by the applicant, and that such suicidal drowning was induced by mental derangement, which fact was fraudulently suppressed.

2d. That the person to whom the policy was issued, viz., Lyman H. Fowler, committed suicide, and thus avoided the policy.

The policy provided that, if the assured " should die by his own hand," &c., " it shall be null and void."

The facts material to the disposition of the case are stated in the opinion.

The court held that there was not sufficient evidence of insanity to make the deceased irresponsible for taking his life, and, upon being requested, refused to submit that question to the jury; to which decision and refusal the counsel for the plaintiff excepted.

The court also refused to submit to the jury the question whether Lyman H. Fowler, in taking his own life, committed

a voluntary or involuntary act, in other words, whether the suicide was voluntary or involuntary; also other questions of a similar character, as requested by the plaintiff's counsel, and directed a verdict in favor of the defendant. Exceptions were duly taken by the plaintiff to these rulings.

A question was also made as to a fraudulent warranty by the assured to induce the company to issue the policy in question, which is not important, as the verdict was directed upon other grounds.

The jury, under the direction of the court, rendered a verdict in favor of the defendant, to which, also, exception was taken. A bill of exceptions was made, which the court directed should be heard in the first instance at General Term.

*J. McGuire*, for the plaintiff.

*L. Robinson*, for the defendant.

Present—MILLER, P. J., HOGEBOOM and PARKER, JJ.

MILLER, P. J. Upon the trial of this case at the circuit, it appeared in evidence that the intestate caused his own death by the use of a pistol, and that there were indications in the room which he occupied that he had also taken poison for the same purpose. There was also found at the time a letter in his handwriting, addressed to his brother, informing him that he had suffered for a long time with the thought of becoming insane in consequence of a disease with which he was afflicted, which he had endeavored to cure, but had finally given up all hope of doing so, and that he had endeavored to put an end to his sufferings that night by poison which he had carried for several days. There was evidence to show that the tendency of the disease with which he was afflicted was to produce a morbid mental state, one of the precursors of insanity; that the deceased was a spiritualist; that for some days, and immediately preceding his death, he appeared to be a little excited; was absent-minded; and one witness testifies that he did not

appear as cheerful or talk as much; that he seemed to stand in a sort of melancholy state, and appeared to have a little fit of the blues. With the exception of the foregoing facts, there was no direct evidence of mental aberration or insanity.

It is claimed by the plaintiff's counsel that the court erred in its rulings upon the trial, and that the case, in any point of view, was one which should have been submitted to the consideration of the jury. In support of this position it is urged that the question is, not whether the party was sane or insane, but whether the act of self-destruction was a criminal, intentional, voluntary act, designed to take life, and the party was, at the precise time, competent to realize the consequences of the means employed to take life. This is, undoubtedly, true; and the act itself must be deliberate, entirely voluntary, and such as evinces knowledge of its nature and character, and that the consequences to arise from it were fully understood. In the case at bar, the testimony did not show any direct manifestation of previous insanity of a positive character; and, unless the suicidal act itself may be considered as evidence of insanity, there were no facts presented which warrant the conclusion that the deceased was insane, and that his death by his own hand was not a premeditated act, which he fully appreciated and comprehended. The letter which he penned before the fatal deed was perpetrated, bears evidence of coolness and deliberation, and, if it is to be interpreted as written, rebuts any presumption that he acted from a sudden insane impulse. He apparently knew the nature of the act he was determined to do, and in advance gave a reason for having perpetrated it.

None of the cases hold that insanity alone excuses the taking of life by the insured. Something more is required; and the courts hold that, if the party is insane, it must be to such an extent as to render him wholly unconscious of the act, to entitle his representatives to recover upon the policy. The leading and only case in this State, where the question has arisen, is that of *Breasted* v. *The Farmers' Loan and Trust Company*, first reported in 4 Hill, 73, where, upon demurrer to the plaintiff's replication to the plea of the defendant that

the deceased committed suicide by drowning, it was held that, in an action upon the policy, the underwriters would be liable, though it appeared that the assured drowned himself, provided the act was done in a fit of insanity. The court said : " The drowning of Comfort was no more *his act,* in the sense of the law, than if he had been impelled by irresistible physical power." This case subsequently appears in 4 Seld., 299, upon an appeal from a judgment rendered by referees in favor of the plaintiff. The referees found that the assured threw himself into the river while insane, for the purpose of drowning himself, not being mentally capable at the time of distinguishing between right and wrong; and the court held that the self-destruction of the insured, under such circumstances, was not within the provisions of the policy.

It will be seen that there is a manifest difference between the case cited and the one now considered. It is, I think, fairly inferable from the finding in *Breasted* v. *The Farmers' Loan and Trust Company (supra)*, that the evidence of insanity was clear and indisputable, and that the testimony did not establish that the act was a voluntary one, committed while entirely conscious of its real character. The judgment was sustained, upon the ground that it did not appear that the killing was voluntary; which widely differs from a case where there is evidence of premeditation.

In *Borradaile* v. *Hunter* (44 Com. Law Rep., 335), the assured threw himself from the parapet of Vauxhall bridge into the river Thames, and was drowned. Upon an issue whether the assured died by his own hands, the jury found that he voluntarily threw himself into the water, knowing at the time that he should thereby destroy his life, and intending to do so; but at the time of committing the act he was not capable of judging between right and wrong. It was held that the policy was avoided, as the proviso included all acts of voluntary self-destruction, and was not limited by the accompanying provisos to acts of felonious suicide. ERSKINE, J., says, in reference to the interpretation of the words employed, which are of the same import as those employed in the policy

upon which this action is founded, " that the only qualification that a liberal interpretation of the words with reference to the nature of the contract requires is, that the act of self-destruction should be the voluntary and willful act of a man having at the time sufficient powers of mind and reason to understand the physical nature and consequences of such act, and having at the time a purpose and intention to cause his death by that act." There was nothing in the case last cited to indicate premeditation or an understanding of the nature and consequences of the act, except the act itself; yet it being voluntary, although done by a party incapable of distinguishing between right and wrong, the verdict was held to be erroneous.

In *Clift* v. *Schwabe* (54 Eng. Com. Law R., 437), the judge upon the trial directed the jury that, in order to find the issue for the defendants, it was necessary that they should be satisfied that the deceased died by his own voluntary act; being then able to distinguish between right and wrong, and to appreciate the nature and quality of the act that he was doing, so as to be a responsible moral agent. The court held that this was erroneous, for that the terms of the policy included all acts of voluntary self-destruction, and, therefore, that if the deceased voluntarily killed himself, it was immaterial whether he was or was not a responsible moral agent. The case of *Dean* v. *Am. Insurance Company* (4 Allen, 96) sustains the same doctrine.

In view of the cases cited, the real question to be determined is, whether there was anything for the jury to decide as to the death of the deceased being voluntary, intentional, and designed. I think that there was no evidence for the consideration of the jury on this subject, and that the evidence would not have been sufficient to have warranted a verdict in favor of the plaintiff, even if the case had been left to the jury. There was no proof of insanity, except what might be inferred from the suicide itself. And even although, as was testified, the tendency to a morbid mental state is one of the precursors of insanity, yet the facts proved

do not show that, in the case of the deceased, he had passed the line when reason had entirely lost its sway, and his self-destruction was an involuntary act beyond his control.   But if insane, the letter which he penned, when on the point of taking the fatal step, contains intrinsic and positive testimony that he was laboring under no delusion as to the physical consequences of the act he was about to commit.   He avows his intention and states his reason for the act.   It is difficult to see how any question can be made as to the act being voluntary and willful, for the purpose of destroying life.   To arrive at such a conclusion, the written statement of the deceased must be disregarded, and the fact must be established that he was insane.   Under the circumstances, I am at loss to see how this can be done, and am of the opinion that there was no question of fact for the jury to pass upon.

If the court was right in the rulings made as to this branch of the case, then the other questions raised are not important. The motion for a new trial must be denied, with costs, and judgment rendered upon the verdict.

Motion denied.*

---

* After argument it was ascertained that Mr. Justice HOGEBOOM could not sit in the case; he therefore took no part in the decision. (See *Van Rensselaer* v. *Witbeck* (2 Lansing, 498). — REP.